IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHARNETTA GADLING-COLE, | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 11-0796 (JBS) |
| v. | : | |
| WEST CHESTER UNIVERSITY, et al., | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

Jacqueline M. Vigilante, Esq.
THE VIGILANTE LAW FIRM, P.C.
99 North Main Street
Mullica Hill, NJ 08062
    Attorney for Plaintiff Charnetta Gadling-Cole

Linda L. Kelly, Attorney General
By: Kevin R. Bradford, Senior Deputy Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
    Attorney for Defendants West Chester University, Eli DeHope,
    Claire Dente, Janet Bradley, Rick Voss and Michele Belliveau

**SIMANDLE**, District Judge:[1]

I.  **INTRODUCTION**

    This matter is before the Court on the motion of Defendants

West Chester University, Eli DeHope, Claire Dente, Janet Bradley,

Rick Voss and Michele Belliveau (collectively, "the Commonwealth

Defendants") for summary judgment.  [Docket Item 30.]  Plaintiff

---

    [1] The undersigned is Chief Judge of the U.S. District Court
for the District of New Jersey, sitting by designation pursuant
to 28 U.S.C. § 292(b).

Charnetta Gadling-Cole filed opposition and the Court heard oral argument.

The instant action arises out of the Plaintiff's employment as a teaching fellow and adjunct professor at West Chester University and Plaintiff's subsequent application for a tenured faculty position with West Chester University's Social Work Department. The Plaintiff claims she was subjected to discriminatory treatment during her employment as an adjunct professor and throughout the hiring process for the assistant professor position in violation of Title VII and 42 U.S.C. § 1983. In particular, the Plaintiff claims that her religious beliefs prevented her from supporting and advocating on behalf of the Lesbian, Gay, Bisexual, Transgender and Queer ("LGBTQ") community and the Commonwealth Defendants unlawfully discriminated against her based on these religious beliefs.

For the reasons discussed below, the Court will grant in part and deny in part the Commonwealth Defendants' motion for summary judgment. Genuine issues of material fact exist which prevent summary judgment as to Plaintiff's claim for religious discrimination in the hiring/promotion process in violation of Title VII. Consequently, the Court will deny summary judgment as to this claim. However, the Court will grant the Commonwealth Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim, constructive discharge claim, retaliation

claim and equal protection claim as the Plaintiff has failed to present sufficient evidence to raise a genuine factual dispute regarding essential elements of these causes of action.

## II.  BACKGROUND

### A.  Statement of Facts

In late-2007, Plaintiff Charnetta Gadling-Cole ("Plaintiff" or "Gadling-Cole") interviewed for the Frederick Douglass Scholarship Institute ("FDSI") to become a teaching scholar at West Chester University ("WCU") in WCU's Social Work Department. (Def.'s Ex. 1, Deposition of Charnetta Gadling-Cole taken October 11, 2012 ("Gadling-Cole Dep.") at 27:25-28:9.)  Plaintiff interviewed with the Social Work Department Chair Dr. Mildred Joyner and faculty from the Social Work Department, including Defendant Dr. Eli DeHope. Defendant Dr. Claire Dente, Defendant Dr. Michele Belliveau, Dr. Larry Williams and Defendant Janet Bradley.  (Gadling-Cole Dep. at 28:10-30:14.)

WCU's Social Work Department is very supportive of the LGBTQ community.  Defendants DeHope, Dente and Bradley are homosexual. Professor Joyner and Defendants Voss and Belliveau are heterosexual but supportive of the LGBTQ community. (Defs.' Statement of Facts ¶¶ 7and 8.)  The Plaintiff, however, believes being homosexual is a choice and this belief is rooted in her religion, Christian Baptist.  (Gadling Cole Dep. at 10:4-6;

221:1-7.)

During the FDSI interview process, Plaintiff told the faculty that she was a member of the Southern Baptist church, that her father was a pastor and she was involved with the faith-based community. (Id. at 34:20-36:7.) At no point during the interviews did the conversation turn to Plaintiff's beliefs with respect to homosexuality.

At the end of the interview process, Ms. Gadling-Cole was offered the Frederick Douglass Teaching Scholarship which she accepted. (Id. at 33:9-10.) Consequently, Plaintiff relocated herself and her family from Georgia to Pennsylvania to accept the scholarship. (Id. at 206:2-4.) While working as a teaching scholar at West Chester University, the Plaintiff was also a doctoral student at Howard University. (Id. at 16:17-19.) Plaintiff ultimately completed her doctorate in December 2010. (Id. at 11:7-12.)

The Frederick Douglass Visiting Scholar position was not a permanent position. (Id. at 33:11-34:11.) However, Plaintiff expected the scholarship to lead to long-term employment with West Chester University as a professor in the Social Work Department. (Pl.'s Ex. 7, Decl. of Charnetta Gadling-Cole ("Gadling-Cole Decl.") at ¶¶ 7-9.)

The Plaintiff began teaching in the Spring 2008 semester as a Frederick Douglass Visiting Scholar and reported directly to

the Frederick Douglass Visiting Scholar Department as well as
Professor Mildred ("Mit") Joyner in the Social Work Department.
(Gadling-Cole Dep. at 44:19-22.)  At the conclusion of her
scholarship term, the Plaintiff was hired as an adjunct professor
in the Undergraduate Social Work Department for the 2008-2009
academic year.  (Id. at ¶ 8.)

Plaintiff Gadling-Cole attended a social work faculty
retreat at the end of her first semester with the department in
the spring of 2008.  (Id. at ¶ 2.)  During this retreat, faculty
members Eli DeHope and Claire Dente discussed an undergraduate
student who was seeking to be admitted into the department as a
candidate for an undergraduate degree in social work.  DeHope and
Dente discussed this student's comments about "Adam and Eve"
versus "Adam and Steve" and how they considered these comments to
be insensitive to the LGBTQ community. (Gadling-Cole Dep. at
47:20-49:8.)  It appeared to the Plaintiff that the student was
being unfairly targeted because of her religious beliefs and that
the other faculty members would reject her admission into the
social work major because of these religious beliefs.  (Gadling-
Cole Decl. at ¶¶ 2, 5.)  The Plaintiff advocated on behalf of the
student because the Plaintiff shared the student's Christian
religious beliefs and the Plaintiff explained to the other
faculty members that she had been taught the same thing with
regard to "Adam and Eve" as a Christian.  (Gadling-Cole Decl. at

¶¶ 3-4.)  The Plaintiff explained that her Christian religious beliefs conflicted with the LGBTQ lifestyle.  (Gadling-Cole Dep. at 47:9-49; 65:3-66:16; Deposition of Michelle Belliveau taken on September 11, 2012 ("Belliveau Dep.") at 205:18-207:19.)

The Plaintiff testified in her deposition that she received a negative reaction from her comments at the faculty meeting and the tone of the meeting drastically changed.  (Gadling-Cole Dep. at 70:16-25.)  After this retreat, the Plaintiff's relationship with several of the faculty members deteriorated and they no longer communicated or collaborated with the Plaintiff as collegially as they did before.  (Id. at 106:1-16.) In particular, Defendant Dente worked with the Plaintiff on the BEST project which brought students and elders in the community together.  During this project, Dente attacked the Plaintiff through an email with a student and also attempted to blame the Plaintiff for not having enough elders participate in the project.  (Id. at 98:20-103:19; 106:17-107.)  Plaintiff's relationship with Defendant Bradley also changed and Plaintiff was treated differently than before the retreat.  (Id. at 117:1-10.)  Lastly, Defendant Belliveau engaged in limited communication with the Plaintiff, would not work on projects with her and did not encourage her students to attend one of Plaintiff's events.  (Id. at 109:10-110:12; 119:18-121:3.)

In September 2008, Plaintiff asked DeHope in an email

conversation to be on her dissertation committee because Plaintiff needed a member of her committee with a specialization in gerontology. (Gadling-Cole Dep. at 129:9-130:8.) DeHope responded, "It would be an honor to be on your dissertation committee." (Gadling-Cole Dep. at 129:17-20; Dep. Exh. DeHope-1.) Also, in the Fall 2008 semester, Defendant DeHope was out on leave and the Plaintiff agreed to teach DeHope's Human Behavior Family Systems course. (Deposition of Eli DeHope taken on September 12, 2012 ("DeHope Dep.") at 119:18-121:3.) However, the Plaintiff refused to teach the LGBTQ segment of the Family Systems course because the segment contained attacks on biblical scripture and Plaintiff felt this was inappropriate for the course. (Gadling-Cole Dep. at 56:13-57:15.) Consequently, DeHope taught the LGBTQ segment of the Family Systems course. (DeHope Dep. at 16:1-14.)

In December 2008, Plaintiff informed Defendant Dente, Defendant Belliveau and Professor Joyner that her dissertation proposal was approved and that "[she] was moving on." (Gadling-Cole Dep. at 131:20-132:9.)

Simultaneously, during the Fall 2008 semester, the Social Work Department began to search for a tenure-track assistant professor. Pursuant to the Collective Bargaining Agreement ("CBA") and West Chester University's Faculty Hiring & Search Procedures, the regular full-time faculty in the Social Work

Department formed a faculty search committee. (Belliveau Dep. at 20:24-21:9; Def.'s Ex. 16, Decl. of Christopher Fiorentino ("Fiorentino Decl.") at ¶¶ 5-8.) The faculty search committee consisted of Defendant Voss, Defendant DeHope, Defendant Dente, Defendant Bradley and was chaired by Defendant Belliveau (collectively "the Faculty Defendants").

The search process was governed by the CBA and West Chester University's hiring policies. Pursuant to the CBA, a candidate cannot be hired unless he or she is recommended by the majority of the regular full-time department faculty and presented to the department chairperson for review. (Fiorentino Decl. ¶¶ 5-6.) After review by the department chairperson, the name of a candidate recommended by the majority of regular full-time department faculty, irrespective of the recommendation of the department chair person, is submitted to the President, along with the recommendation of the department chair person. (Id. at ¶ 7.) The President then may accept or reject the recommendation of the department faculty, including the recommendation of the department chairperson, and that decision is final. (Id. at ¶ 8.)

West Chester's hiring policy required the search committee to create an advertisement for the assistant professor position and a screening document to be used to evaluate the applications received. (Belliveau Dep. at 34:12-24; Fiorentino Decl., Ex. B

8

at 3.)  These materials were reviewed and approved by the University's Social Equity Department.  (Belliveau Dep. at 34:12-35:11.)  However, the advertisement and screening tool were inconsistent with one another in regards to an applicant's previous teaching experience.  The advertisement indicated that previous undergraduate teaching experience was preferred while the screening tool treated undergraduate teaching experience as a mandatory criterion.  (Belliveau Dep. Ex. D-4; Pl.'s Ex. 4.)

In order to be considered for the position, the advertisement instructed applicants to submit various materials, including three letters of reference, to Defendant Belliveau by January 31, 2009.  (Belliveau Dep. Ex. D-4.)  Applicants were also required to have obtained their Ph.D./DSW or achieved all but dissertation (ABD) status with a definite date of completion. (Id.).

Plaintiff submitted an application for the position and the papers initially submitted did not include her letters of reference.  (Gadling-Cole Dep. at 147:8-148:10.)  On November 19, 2008, Defendant Belliveau informed Plaintiff via e-mail that the committee was beginning their review of applications and that she had received Plaintiff's application, but not her letters of reference.  (Id. at 147:8-148:10; Dep. Ex. D-5.)  Plaintiff responded by e-mail informing Belliveau that the letters were forthcoming.  (Id.)

Shortly thereafter, the search committee received two letters of reference on behalf of the Plaintiff. It is disputed whether the search committee received Plaintiff's third letter of recommendation. The Plaintiff's third recommender, Gail Robinson, e-mailed the Plaintiff a digital copy of her letter and indicated that the original had been or was about to be sent directly to Defendant Belliveau. (Gadling-Cole Dep. at 155:1-157:25, Dep. Ex. D-8.)[2] Defendant Belliveau denies receiving Plaintiff's third letter of recommendation; however, Belliveau did not follow up further with the Plaintiff regarding the status of her recommendations. (Belliveau Dep. at 53:2-13; 127:7-17; 129:12-20.) Nothing in the subsequently discovered email chain confirms that Robinson actually sent the letter of recommendation

---

[2] After oral argument, the parties submitted supplemental briefing regarding the email communications between the Plaintiff and her third recommender, Gail Robertson. The Plaintiff submitted additional email communication wherein the Plaintiff provided Robertson with Belliveau's contact information and Robertson asked Plaintiff to check the letter prior to sending it out. Robertson, though, failed to attached the draft recommendation letter to the email. [Docket Item 38-1.]

Defendants object to these emails as they were not previously disclosed by the Plaintiff. However, Defendants acknowledge that these emails merely restate evidence already in the record because the Plaintiff testified to the content of this email exchange in her deposition. Therefore, the Court is required to accept this testimony as true for purposes of this motion for summary judgment. [Docket Item 39.]

The Court notes that this supplemental submission by the Plaintiff is duplicative of evidence already in the record and does not affect the Court's analysis of the instant summary judgment motion.

to Belliveau.[3]

The search committee received numerous applications for the assistant professor position and reviewed each application. The search committee disqualified three candidates because they had an "incomplete application." (Pl.'s Ex. 16.) Two other candidates were excluded because they did not meet the "education requirements" for the position. (Id.) By mid-January, the search committee had decided to invite the top four candidates to campus for an interview. Plaintiff's application was not deemed incomplete and Plaintiff was one of the four candidates selected for an on-campus interview. Specifically, the search committee indicated that Plaintiff was "Qualified and selected for interview/campus visit." (Id.)

Of the four candidates selected for an on-campus interview, two candidates withdrew their applications from consideration. As a result, only the Plaintiff and one other candidate, Lisa Johnson, were under consideration for the assistant professor position. (Belliveau Dep. at 4:17-45:3.) Lisa Johnson was scheduled to interview on February 9 and 10, 2009 while the Plaintiff was scheduled to interview on February 12 and 13, 2009. (Pl.'s Ex. 8, Belliveau Dep. at 174:21-175:3.)

On February 4, 2009, Defendant DeHope, who was a member of the search committee, asked the Plaintiff if they could meet.

---

[3] See n.2, supra.

(Gadling-Cole Dep. at 138:12-21.) Plaintiff was unaware of the purpose of the meeting, but arranged to meet with DeHope on February 9, 2009, the first day of the on-campus interviews. (Id. at 139:4-6.) During this meeting, DeHope criticized the Plaintiff and told her she was not a good fit for the department. (Gadling-Cole Dep. at 140:10-142:16.) The Plaintiff's religion, sexual orientation and Plaintiff's position with respect to the LGBTQ community were not discussed at the meeting. However, the hostility that Plaintiff experienced by members of the Social Work Department was discussed. (Pl.'s Ex. 6.) The Plaintiff was upset by the meeting and went to Professor Joyner to complain. (Gadling Cole Dep. at 142:17-143:25.) Professor Joyner informed the Plaintiff that she would speak to DeHope. (Id. at 143:22-25.)

The search committee then proceeded with the interviews. The interview process for both candidates spanned two days and included a teaching demonstration, a panel interview, individual interviews, a breakfast, a luncheon and a dinner. (Deposition of Rick Voss taken September 13, 2012 ("Voss Dep.") at 47:4-14.) During the first day, the candidates participated in a breakfast with faculty and students, then presented a teaching demonstration, then met with the faculty search committee for a panel interview. (Pl.'s Ex. 8.) The questions asked during the panel interview were taken from a pre-approved list which was

compiled by the search committee and submitted to the Social Equity Department for review. (Voss Dep. at 32:9-33:10; Belliveau Dep. at 58:13-59:23.) At the conclusion of the first day, the candidates attended a dinner with one faculty member and the Chair of the Department, Professor Joyner. (Belliveau Dep. at 94:6-7.) The second day included a meeting with Dean Fiorentino, a meeting with Professor Joyner, a meeting with Defendant Bradley and a wrap-up meeting with Defendant Belliveau. (Pl.'s Ex. 8, Belliveau Dep. at 93:13-94:5.)

The Plaintiff was present for a portion of Johnson's breakfast segment but otherwise did not see or participate in Johnson's interview. (Gadling-Cole Dep. at 200:3-201:4.) At the breakfast, Plaintiff observed that more faculty members were in attendance and there was a more positive atmosphere when compared to her own interview experience. (Id. at 200:3-201:14.)

Defendant Bradley attended the dinner with Johnson and Professor Joyner. Defendant Bradley became aware that Johnson was a homosexual when Johnson asked Bradley if her "partner" could attend the dinner. (Deposition of Janet Bradley taken September 12, 2012 ("Bradley Dep.") at 50:16-51:2.) During the interview dinner, Professor Joyner asked Johnson if she was "going to wear her hat as an African American woman or her hat as a gay woman." (Bradley Dep. at 51:10-16).

The scheduled agenda was not followed for the Plaintiff's

interview process. (Deposition of Mildred Joyner taken on November 19, 2012 ("Joyner Dep.") at 15:18-20.) Specifically, Belliveau did not attend the welcome breakfast on the first day of Plaintiff's interview and did not attend the wrap up interview on Plaintiff's second day because her child was sick. Instead, Professor Joyner conducted the wrap up session. (Belliveau Dep. at 93:13-24.) Finally, during the panel interview, the Plaintiff was asked questions which deviated from the pre-approved list of questions submitted to the Social Equity Department. (Voss Dep. at 32:9-33:10.)

After both interviews were completed, the search committee met to review the candidates and determine their recommendation on February 16, 2009. (Belliveau Dep. at 46:6-9.) This differed from past faculty searches where the committee and chair had a single meeting to discuss the candidates and jointly recommend the same candidate to the Dean. (Joyner Dep. at 67:12-18.) The search committee decided to meet separately because Defendant Voss, who was on the committee and the newly appointed union representative, determined that the CBA required the search committee to conduct deliberations independent of the department chairperson. (Voss Dep. at 135:15-137:7.) Voss was also concerned that Professor Joyner had developed a personal bond with the Plaintiff and would therefore try to sway the recommendation. (Id. at 120:16-123:3; 131:4-132:8.)

14

At the meeting on February 16, 2009, the committee agreed that they wanted to recommend Johnson for the position. (Belliveau Dep. at 46:6-48:20.)  However, the committee had not conducted reference checks for either candidate and therefore could not make a formal recommendation to the Dean.  (Fiorentino Decl. ¶ 9.)  Defendant DeHope was assigned to check Johnson's references and Defendant Voss was assigned to check Plaintiff's references.  Voss called one of Plaintiff's references, Chad Lassiter and left numerous voicemail messages and an email request, questioning the relationship between Plaintiff and Lassiter, which Lassiter found unusual.  (Pl.'s Ex. 6, Social Equity Complaint and Plaintiff's Ex. 10, Chad Lassiter's Emails.) No one communicated to the Plaintiff that she was missing one letter of reference.  (Gadling-Cole Decl. ¶15.)

At the conclusion of the February 16, 2009, meeting, Belliveau prepared a chart on each candidate's strengths and weaknesses.  (Pl.'s Ex. 11.)  The chart indicated the following concerns with the Plaintiff: letters of reference (quantity and relationship to candidate); no clear-cut framework for teaching content; clarity of theory base; does not have departmental history of collaboration; communication style; indefinite date of completion for her doctorate.  The chart indicated the following concerns with Johnson: Chair's concern about misinformation in content of teaching demonstration; new to teaching; and plan for

15

completion of dissertation contingent on outside agency approval. (Pl.'s Ex. 11.)

On February 18, 2009, the committee met with Joyner, presented their chart and informed Joyner of its recommendation. Joyner was upset that the committee deliberated without her and did not follow the protocol that had been used in the past when conducting faculty searches. (Joyner Dep. at 72:12-19.) Joyner had concerns about Johnson as a candidate since she imparted inaccurate information in her teaching demonstration and could not adequately handle students challenging her presentation. (Joyner Dep. 27:9-29:23.) Joyner also brought up the fact that the screening instrument listed undergraduate teaching experience as a requirement and that Johnson did not have prior undergraduate teaching experience. (Joyner Dep. at 78:8-80:3.)

Meanwhile, the week after her interview concluded on February 18, 2009, the Plaintiff emailed Belliveau requesting a meeting to discuss her "concerns regarding the handling of my candidacy of [sic] the faculty position in the Undergraduate Department of Social Work." (Dep. Ex. D-9.) Belliveau responded that she would be happy to talk to her about her concerns even though she "was still in the midst of the search process." (Id.) At this point in time, however, the committee had decided to recommend Johnson and had informed Joyner of their decision. The Plaintiff emailed Belliveau that she was available to meet on

February 23, 2009 to "immediately address what I deem as inappropriate/ discriminatory actions." (Id.)

Belliveau communicated to the Dean and the other members of the search committee that the Plaintiff wanted to meet with her regarding the search process. Belliveau was advised by the Dean that the Social Equity Department should address any discrimination concerns and that Belliveau should not meet with the candidate until after the conclusion of the search process. (Belliveau Dep. at 107:24-110:16.) Consequently, Belliveau informed the Plaintiff that she could not meet with her until the search process was completed. (Id. at 94:19-96:15; 100:24-101:10.) Plaintiff responded the following evening and said that she would move forward with her complaint through the Social Equity Department since Belliveau could not meet with her. (Dep. Ex. D-9.)

Belliveau contacted the Director of the Social Equity Department, Richeleen Dashield, to discuss the Plaintiff's complaints with the search process, on February 23, 2009, at Dashield's request. (Belliveau Dep. at 101:11-23.) During this conversation, Belliveau told Dashield that the Plaintiff was not a finalist for the position. (Id.)

Following the meeting with Joyner, Belliveau individually called members over the weekend to confirm their support for submitting the recommendation of Johnson to the Dean. (Bradley

17

Dep. 68:19-69:6.)  Belliveau, DeHope, Voss and Dente each recommended Johnson for the position.  (Belliveau Dep. at 102:5-19.)  On Monday February 23, 2009, Belliveau presented the committee's recommendation of Johnson to Dean Fiorentino.  (Id. at 102:17-19.)  Belliveau also circulated an email confirming the decision, including the rationale for Plaintiff's non-selection.  (Pl.'s Ex. 15.)  This email indicated that the Plaintiff "[d]id not meet position requirements:  No date of definite plan for completion of dissertation; incomplete letters of reference."  Id.

After learning the search committee had submitted their recommendation to the Dean on February 23, 2009, Joyner circulated a memo to the Dean and Belliveau.  (Joyner Dep. 25:19-26:1.)  The memo stated that "in fact, after reviewing the entire process of the 2009 Undergraduate Social Work Search, I feel the search should be aborted since it is evident that the entire search committee needs to develop the skills needed to conduct an ethical and fair search."  (Pl.'s Ex. 9.)

Dean Fiorentino notified Belliveau on February 24, 2009, that he would not support the committee's recommendation for Johnson since she lacked undergraduate teaching experience.  The Dean informed Belliveau if the search committee would not choose Plaintiff for the position, they would need to go back to their search.  (Belliveau Dep. 119:22-120:5.)

The search committee decided not to recommend Plaintiff for the position and notified her on February 24, 2009, that her name had not been forwarded for the position. (Belliveau Dep. 125:3-11.) Belliveau then submitted the committee's rationale for not selecting the Plaintiff to the Social Equity Department in accordance with WCU's Faculty Hiring and Search Procedures. Belliveau stated that the Plaintiff was not selected because she "[d]id not meet position requirements: No date for completion of dissertation; incomplete letters of reference." (Belliveau Dep. at 185:6-186:14; Dep. Ex. Belliveau-14.) Dean Fiorentino also reviewed Plaintiff's application and determined she did not meet the minimum requirements because her file only contained two letters of recommendation and did not contain any documentation verifying her plan for completion of her dissertation. (Fiorentino Decl. ¶ 21.)

On March 10, 2009, Dean Fiorentino notified the search committee that the search process was suspended. (Belliveau Dep. at 138:3-17.) Neither the Plaintiff nor Johnson was offered the assistant professor position.

Plaintiff filed a grievance with the Social Equity Department on February 27, 2009 regarding unlawful discrimination before, during and after the search process. (Dep. Ex. D-12.) The grievance stated that the Plaintiff "found that if you are not a member or ally of the LGBTQ community you are ridiculed if

you are faculty or student." (Id.)  The Plaintiff named each member of the search committee, the Faculty Defendants, as having discriminated against her.  (Id.)  Plaintiff also completed and submitted a discrimination intake form with the Social Equity Department and indicated that she based her allegations on religious and sexual orientation discrimination.  (Dep. Ex. D-13.)

The Faculty Defendants were notified by the Social Equity Department that the Plaintiff had filed a discrimination complaint against them.  The notification instructed the Faculty Defendants not to discuss the subject matter of the complaint with anyone.  (Belliveau Dep. at 189:1-22.)

After the search process concluded, Joyner noticed that the faculty was not engaging with the Plaintiff and did not involve the Plaintiff in the end of the semester activity with the students.  (Joyner Dep. at 105:1-106:3) Plaintiff also experienced increased hostility from students after February 2009. (Id. at 216:1-218:25.)  Belliveau did not communicate with Plaintiff after the search process besides to convey routine departmental information. (Belliveau Dep. at 136:12-24.)  DeHope also avoided the Plaintiff after the search process.  (DeHope Dep. at 100:8-14; 107:5-11.)

In May 2009, Plaintiff was not offered a contract to come back as an adjunct instructor as a result of the search process

and the deteriorating relationship between the Plaintiff and the faculty. (Joyner Dep. at 114:7-115:2.) The decision not to renew Plaintiff's adjunct contract was made jointly by Joyner as the Department Chair and Dean Fiorentino. Joyner and Fiorentino agreed that because the search committee had determined Plaintiff was not a fit in the department, the Plaintiff's adjunct contract should not be renewed. Both Joyner and the Dean agreed the better course of action was to issue Plaintiff positive recommendations in order for her to find another position. (Id. at 114:9-115:10.) Plaintiff was the first adjunct who applied for a tenure position in the Social Work Department at WCU who was denied. (Id. at 123:19-124:1.)

**B. Procedural History**

The Plaintiff filed the instant action on February 2, 2011, against Defendants West Chester University, Eli DeHope, Claire Dente, Janet Bradley, Rick Voss and Michele Belliveau. The Plaintiff then filed an amended complaint in response to the Commonwealth Defendants' motion to dismiss. The amended complaint contained six counts including a claim for religious discrimination and hostile work environment against the Defendants, a claim for retaliation against WCU, and claims against the individual defendants for violations of the Plaintiff's First Amendment Rights and Equal Protection under 42 U.S.C. § 1983.

The Commonwealth Defendants filed a motion to dismiss Plaintiff's amended complaint. This Court issued an opinion granting in part and denying in part Defendants' motion. The Court dismissed Plaintiff's Title VII claims against the individual Faculty Defendants as well as Plaintiff's First Amendment claims. The Court permitted the Plaintiff to proceed with her claims of religious discrimination and hostile work environment against WCU and her equal protection claims against the Faculty Defendants. [Docket Items 14 & 15, March 29, 2012 Opinion and Order.]

Discovery is complete and the Commonwealth Defendants now move for summary judgment as to Plaintiff's remaining claims. The Plaintiff filed timely opposition and the Court heard oral argument. For the reasons discussed below, the Court will grant in part and deny in part the Defendants' motion for summary judgment.

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."

See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  <u>Id.</u>  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  <u>Id.</u>  The Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party.  <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999).  <u>See also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").

### B.  Title VII Claims for Religious Discrimination Against West Chester University

The Plaintiff's amended complaint brings four separate religious discrimination claims against West Chester University ("WCU") pursuant to Title VII: religious discrimination in the hiring/promotion process (Count I); hostile work environment (Count II); employment discrimination/constructive discharge (Count III); and retaliation (Count IV).  Each claim will be analyzed separately below.

### 1.  <u>Religious Discrimination in the Hiring/Promotion Process (Count I)</u>

Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against

any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a).[4]  In addition to protecting employees from religious discrimination against them on the basis of their beliefs, Title VII also protects employees from forced religious conformity.  Prowel, 579 F.3d 285, 292 (3d Cir. 2009)(citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993)).

An employee claiming that her failure to be hired was the result of discrimination in violation of Title VII is subject to the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  McDonnell held that a complainant must first put forth sufficient evidence to establish a prima facie case for discrimination.  If the plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell, 411 U.S. at 802. See also Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (articulating the burden-shifting scheme).  The employer must introduce evidence which, if taken as true, would permit the conclusion

---

[4] Religion is defined as "aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

that a nondiscriminatory reason motivated the adverse employment action. Fuentes, 32 F.3d at 763 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). This burden is "relatively light." Id.

When an employer articulates a nondiscriminatory reason for the adverse employment action and introduces evidence in support thereof, the burden shifts back to the plaintiff, who may defeat summary judgment by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764 (citing Hicks, 509 U.S. at 510-11). The plaintiff must demonstrate by a preponderance of the evidence that the proffered reason is pretextual and that the true reason is discriminatory or retaliatory. Sanborn, 431 Fed. Appx. at 190; see also Fuentes, 32 F.3d at 764 (rejecting the contentions that a plaintiff may argue merely that the factfinder may disbelieve the defendant or that the plaintiff must adduce evidence directly contradicting the defendant's proffered legitimate explanations).

### a. *Prima Facie Case*

In order to establish a prima facie case of discrimination in the hiring process, the Plaintiff must establish that (1) she

is a member of the protected class; (2) that she was qualified and rejected for the position she sought; (3) she suffered an adverse employment action; and (4) after her rejection, the position remained open and the employer continued to seek applicants. <u>McDonnell</u>, 411 U.S. at 802. The Supreme Court later clarified that <u>McDonnell</u> did not create "an inflexible formulation" to establish a prima facie case and that the proof required will necessarily change in different factual situations. <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324 (1977); <u>see also</u> <u>McDonnell</u>, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."). The Third Circuit has held that usually "some showing must be made that the plaintiff was treated differently from similarly situated individuals" of different races, gender, religion or national origin. <u>Jackson v. U.S. Steel Corp.</u>, 624 F.2d 436, 440-41 (3d Cir. 1980).

The Defendants argue that the Plaintiff cannot establish a prima facie case because she was not qualified for the position and the search was ultimately aborted. The Defendants maintain that the Plaintiff did not provide a third letter of recommendation or a definite date of completion for her dissertation and therefore was not qualified. Further, the

Defendants contend that since the search was aborted, the Plaintiff cannot meet the fourth element of her prima facie case because there is no evidence that West Chester University hired a person who did not share Plaintiff's religious beliefs with regard to the LGBTQ community.

The Plaintiff argues that a genuine issue of material fact exists as to whether she was qualified for the position. The Plaintiff relies on the fact that she was deemed "qualified" by the search committee during the initial review of her application and chosen for an on-campus interview. Further, none of the search committee members noted on their screening tool that the Plaintiff was not qualified or that her application was incomplete. In addition, Plaintiff argues there is evidence that her third recommender sent her letter directly to Belliveau and Belliveau never followed up with the Plaintiff regarding the status of the third letter. The Plaintiff also had two letters of recommendation on file with WCU when she had applied for the Frederick Douglass Teaching Scholar position. As to Plaintiff's dissertation date, the Plaintiff argues that the search committee knew she had successfully defended her dissertation and a definite date of completion could easily been confirmed by the search committee members with a phone call to Plaintiff's dissertation chair. The search committee never called or attempted to verify her date of completion. Consequently, the

Plaintiff argues that there is sufficient evidence she was qualified for the position.

The Plaintiff also argues that she can establish the fourth element of her prima facie case even though the search for the assistant professor position was ultimately aborted. The Plaintiff argues that there is ample evidence from which a jury could find she was treated less favorably because of her religious beliefs which precluded her from supporting the LGBTQ community. Further, the Plaintiff maintains that cancellation of the search does not bar a prima facie case of discrimination. The Plaintiff relies on Moore v. Abbott Labs., 780 F. Supp. 2d 600, 613 (S.D. Ohio 2011), which held, "if the plaintiff can establish that the defendant cancelled the position specifically to unlawfully discriminate against the plaintiff," then the fourth element of the prima facie case is satisfied. Here, the Plaintiff maintains that a jury could conclude the search was cancelled because the search committee refused to reconsider Plaintiff for the position. The Plaintiff argues that a jury could conclude the only reason Plaintiff was not recommended by the search committee was because of her religious beliefs toward the LGBTQ community.

The Court finds genuine issues of material fact exist which prevent summary judgment and a rational jury could find that the Plaintiff has established a prima facie case of discrimination.

A jury could find that the Plaintiff was qualified for the assistant professor position.  The search committee's chart evaluating all the candidates identified Plaintiff as "Qualified" and the search committee ultimately selected her for an on-campus interview.  The allegedly missing third letter of recommendation and definite date of completion for her dissertation were apparent on the face of her application.  A jury could conclude that these items did not disqualify Plaintiff from consideration because the search committee identified her as one of the top candidates and moved her forward in the interview process.

Further, the Plaintiff should not be barred from establishing her prima facie case of discrimination because the search was ultimately aborted.  The Supreme Court has rejected the argument that a plaintiff's prima facie case is "an inflexible formulation" and rather concluded that the proof required for a discrimination claim will necessarily change in different factual situations.  <u>Int'l Bhd. of Teamsters v. United States</u>, <u>supra</u>, 431 U.S. at 358.  The Third Circuit has further clarified that the elements specified in the prima facie case "need not be present in every Title VII case" so long as the plaintiff "nonetheless offer[s] sufficient evidence to create an inference that the employer's action was based on impermissible reasons."  <u>Jackson v. U.S. Steel Corp.</u>, 624 F.2d at 440.

A jury could find that the search was aborted because the

search committee refused to recommend Plaintiff because of her religious beliefs. There is evidence in the record from which the jury could find that the Dean would have supported the Plaintiff's candidacy if the search committee would have recommended her for the position. There is also evidence that the Plaintiff was treated differently by the faculty after she revealed her religious beliefs about the LGBTQ community. Further, the candidate who was advanced by the search committee was a member and supporter of the LGBTQ community and received more favorable treatment during the interview process. Consequently, a rational jury could conclude that the reason the search was cancelled was because the search committee religiously discriminated against the Plaintiff.[5]

---

[5] There is also a material factual dispute whether Plaintiff was downgraded due to her apparent anti-gay animus - a legitimate concern in a public educational institution - or due to her practice of her religion, which taught that homosexuality is a sin. Title VII protects against discrimination based on religion, and not against discrimination based upon viewpoint. It will be Plaintiff's burden to demonstrate that her religious practice was at issue and was a factor in the decision to abort the selection process, as opposed to a legitimate concern that she harbored anti-LGBTQ animus that made her unfit for university level teaching. Since Plaintiff has herself characterized her views as a religious practice, the Court must accept such a characterization in this summary judgment motion practice. The parties are invited to focus upon this issue of the scope of protection for religiously based views under Title VII, in light of concerns that a practice of a religion that preaches discrimination against a class or category of persons could scarcely seek to be protected by Title VII. Neither party has briefed this fundamental question of Title VII's protection against religious discrimination.

Therefore, genuine issues of fact exist and a rational jury could find that the Plaintiff has established a prima facie case of religious discrimination in the hiring/promotion process.

b. _Pretext_

The Plaintiff does not dispute that West Chester University has met its burden of production to show legitimate, non-discriminatory reasons for not hiring the Plaintiff. Defendant WCU has presented evidence that the search committee's reason for not selecting the Plaintiff was because she was missing a third letter of recommendation and did not provide a definite date of completion for her dissertation. In addition, the record shows that members of the search committee were concerned with the quality of Plaintiff's reference letters and some of the answers Plaintiff gave during the panel interview.

The Plaintiff argues, however, that a rational jury could find that WCU's proffered reasons were pretext for discrimination. Specifically, Plaintiff contends that a pretext claim can be satisfied by establishing procedural regularities in the search process. The Plaintiff relies on Zahorik v. Cornell Univ., 729 F.2d 85, 93 (2d Cir. 1984) where the Second Circuit held, "[d]epartures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process." Id. The Plaintiff maintains that the record shows the search committee deviated from the

established faculty hiring procedures.  Specifically, a member of the search committee met with the Plaintiff on the first day of the on-campus interviews and criticized her for not being a good fit with the department.  The Plaintiff was asked questions in the panel interview which deviated from the approved list of interview questions.  The chair of the search committee did not meet with the Plaintiff to conclude the on-campus interview.  The search committee did not deliberate with the chair of the department and excluded the chair from their meeting.  Finally, the search committee did not check all of Plaintiff's references and instead called one reference after the committee had decided to recommend Johnson.  Consequently, the Plaintiff argues summary judgment should be denied.

The Court finds that genuine issues of material fact exist as to whether WCU's proffered reasons for not hiring the Plaintiff were pretextual.  A plaintiff's evidence rebutting the articulated legitimate reasons must permit a factfinder reasonably to infer that "each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action . . . ." Fuentes, 32 F.3d at 764 (citing Logue v. Int'l Rehab. Assocs. Inc., 837 F.2d 150, 155 (3d Cir. 1988) and Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994)).  A plaintiff must demonstrate that the employer's legitimate reasons

contain "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that a reasonable factfinder could rationally find the proffered reasons "unworthy of credence." Id. at 765 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

As discussed above, there is evidence from which a jury could conclude that the main reasons offered by the search committee for not hiring the Plaintiff - a missing third letter of recommendation and no definite date of completion for her dissertation - are not legitimate. The Plaintiff had taught with the Faculty Defendants on the search committee for a year prior to the interview process and was an active part of the Social Work Department as an adjunct instructor. The need for a third letter of recommendation could be considered trivial by the jury in light of Plaintiff's extensive experience teaching with the WCU Social Work Department. Further, one of the search committee members, Defendant DeHope, was on Plaintiff's dissertation committee and could easily have learned any additional information needed with regard to the status of Plaintiff's thesis.

With regard to the search committee's concerns about Plaintiff's interview answers, these were not listed as reasons for nonselection of the Plaintiff by the search committee. In addition, it is undisputed that the search committee deviated

from the prepared list of questions when conducting Plaintiff's interview. This procedural irregularity calls into question whether this reason offered by WCU is legitimate or pretextual. A jury could conclude that these reasons did not actually motivate the committee's decision not to recommend the Plaintiff for the assistant professor position. Moreover, the departmental Chair, Dr. Joyner, labeled the selection process unfair.

Therefore, summary judgment is inappropriate to dismiss Plaintiff's religious discrimination claim regarding the hiring process for the assistant professor position. Accordingly, Defendants' motion with regard to this claim will be denied.

## 2. Hostile Work Environment (Count II)

To establish a Title VII claim premised on a religiously hostile work environment, a plaintiff must demonstrate five elements: (1) the employee suffered intentional discrimination because of religion; (2) the discrimination was pervasive and severe; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a person of the same religion in that position; and (5) the existence of respondeat superior liability. Neal v. Genesis Properties of Delaware, LTD. Partnership, L.P., 870 F. Supp. 2d 369, 376 (D. Del. 2012)(quoting Abramson v. William Paterson College of NJ, 260 F.3d 265, 276-77 (3d Cir. 2001)).

"When the hostile work environment is created by a victim's

34

non-supervisory coworkers, the employer is not automatically liable." Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009). "Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Id.

Here, the Plaintiff has failed to present any evidence to establish the fifth element of her hostile work environment claim. It is undisputed that the complained of discriminatory conduct was created by Plaintiff's non-supervisory colleagues. There is no evidence that Plaintiff's supervisor, Professor Joyner, participated in or facilitated the creation of a hostile work environment or failed to take remedial action. In addition, WCU provided a reasonable avenue for complaint through the Social Equity Department's grievance procedure which the Plaintiff utilized.

Therefore, since the Plaintiff has not established the existence of respondeat superior liability, summary judgment will be granted as to this claim.

### 3.    Employment Discrimination/Constructive Discharge (Count III)

The Plaintiff's complaint lists Count III as simply an "employment discrimination" claim against WCU. In its motion for summary judgment, WCU argues the Plaintiff is essentially making

35

a constructive discharge claim.  The Plaintiff does not refute this characterization of Count III in her opposition.

"A constructive discharge claim requires the establishment of a hostile work environment followed by proof that conditions created by the hostile work environment were so intolerable a reasonable person subject to them would resign."  Owens v. Allegheny Valley School, 869 F. Supp. 2d 653, 660 (W.D. Pa 2012).

As discussed above, the Plaintiff has not established that a hostile work environment for which WCU could be liable existed. Consequently, Plaintiff's claim for constructive discharge cannot be sustained.  The Plaintiff presents no arguments in her opposition to the contrary.  Therefore, WCU's motion for summary judgment will be granted as to Count III.

### 4.  Retaliation (Count IV)

To establish a prima facie case of retaliation under Title VII, a plaintiff must prove that: "(1) she engaged in activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) there is a causal connection between her participation in the protected activity and the adverse employment action."  Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).  A "causal connection" between the materially adverse action and the retaliation may be established by a "broad array of evidence" and

> [w]here the time between the protected activity and
> adverse action is not so close as to be unusually

36

suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee . . . or other types of circumstantial evidence . . . that give rise to an inference of causation when considered as a whole.

Id. at 302 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997) and Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000)).

The parties do not dispute that the Plaintiff engaged in protected activity by filing a complaint of discrimination with the Social Equity Department in February 2009 and subsequently filing a formal grievance in March 2009. The Plaintiff maintains that she suffered an adverse employment action because she was not offered to renew her adjunct faculty contract the following year. The issue is whether a rational jury could find that there is a causal relationship between Plaintiff filing her grievance and not receiving an offer to renew her employment.

The Plaintiff argues that causation can be established by showing: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism in the intervening time between the protected activity and the adverse employment action. Van Houten v. Principi, 2003 U.S. Dist. LEXIS 15517, at *7-8 (E.D. Pa. July 30, 2003). The Plaintiff maintains that she filed her grievance at the end of February 2009 and did not receive an offer to renew her adjunct position approximately two months later. Further,

the Plaintiff argues that after she filed her grievance, the faculty frustrated her ability to be an effective educator, undermined her authority as a professor and refused to collaborate with her on projects. The Plaintiff contends that this is sufficient to establish a genuine issue of fact as to causation.

The Defendants argue that the record is clear that Dean Fiorentino and Professor Joyner were responsible for the decision not to renew Plaintiff's adjunct position. It is undisputed that the Plaintiff did not file any grievance against Fiorentino or Joyner and there is no evidence in the record that these individuals were antagonistic to the Plaintiff in any way. Further, the record suggests that the Faculty Defendants were hostile to the Plaintiff prior to any grievance being filed. Therefore, the Defendants argue that the Plaintiff cannot establish causation and summary judgment is appropriate.

The Court finds the Defendants' argument persuasive. No rational factfinder could conclude that Fiorentino and Joyner decided against renewing Plaintiff's adjunct position because she engaged in protected activity. The Plaintiff did not file a grievance against Fiorentino or Joyner and there is no evidence that these individuals were hostile to the Plaintiff or became antagonistic to the Plaintiff after she filed her grievance. Rather, Joyner testified that the reason Plaintiff's contract was

not renewed was because the search committee did not recommend her for the assistant professor position and consequently, Joyner concluded that the current faculty in the Social Work Department did not consider Plaintiff a good fit.  Joyner and Fiorentino then jointly agreed that the better course for Plaintiff's career was to encourage her to find other employment and provide positive references for her.

This is the only evidence in the record regarding the decision not to offer Plaintiff an adjunct position the following year.  It is clear that this decision was made without reference to the Plaintiff engaging in protected activity.

Accordingly, the Court concludes that no rational jury could conclude that the decision not to renew Plaintiff's adjunct position was caused by Plaintiff filing a grievance with the Social Equity Department.  Therefore, the Court will grant the Defendants' motion for summary judgment and dismiss Plaintiff's retaliation claim against WCU.

### C.  Equal Protection Claim against Faculty Defendants

The Plaintiff's final claim is against Defendants Eli DeHope, Claire Dente, Janet Bradley, Rick Voss and Michele Belliveau ("Faculty Defendants") for violating her right to equal protection.  The Plaintiff claims Johnson was treated more favorably as a candidate by the Faculty Defendants during the interview process because Johnson did not share Plaintiff's

religious beliefs with regard to the LGBTQ community.

In order to state a claim for denial of equal protection under the Fourteenth Amendment pursuant to § 1983, a plaintiff must allege she is a member of a protected class and similarly situated members of an unprotected class were treated differently than the plaintiff.  Kuhar v. Greensburg-Salem Sc. Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980); Pollack v. City of Philadelphia, No. 06-4089, 2007 WL 576264, at *4 (E.D. Pa. Feb. 16, 2007)(citing Young v. New Sewickley Twp., 160 F. Appx. 263, 266 (3d Cir. 2005)).  Further, a plaintiff must establish that the discrimination was purposeful.  Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990); see also Epstein v. Pittsburgh School Dist., No. 10-1593, 2011 WL 4368371, *6 (E.D. Pa. Sept. 19, 2011) and Morrison v. Philadelphia Housing Authority, No. 00-2847, 2002 WL 538983, *13 (E.D. Pa. April 11, 2002).

"This is what distinguishes § 1983 equal protection claims from Title VII cases; to prevail on a § 1983 claim, a plaintiff must prove that the defendant intended to discriminate."  Williams v. Pennsylvania State Police Bureau of Liquor Control Enforcement, 108 F. Supp. 2d 460, 471 (E.D. Pa. 2000).  While a plaintiff can produce direct or indirect proof of purposeful discrimination to establish an equal protection violation, "the threshold of indirect proof for a *prima facie* case of equal protection violation is higher than in a Title VII case; a § 1983

plaintiff must show . . . some additional indicia of purposeful discrimination." Id.

Here, the Plaintiff has failed to present sufficient evidence that the Faculty Defendants intended to discriminate against Plaintiff because of her religion which is necessary to establish her equal protection claim. Instead, Plaintiff simply repackages her Title VII claim as an equal protection claim without presenting any additional indicia of purposeful discrimination.

There is no evidence in the record that Plaintiff's religious beliefs were discussed by the search committee during the interview process. The Plaintiff was not questioned during the interview process regarding her religion or her religious beliefs about the LGBTQ community. Plaintiff herself testified during her deposition that her religion was not discussed during the interview process or even during her unorthodox meeting with Defendant DeHope prior to her interview.

Significantly, the record does not contain evidence regarding Johnson's religion and whether Johnson's religion was known to the search committee. While Defendant Bradley became aware of Johnson's homosexuality during the interview dinner, there is no evidence in the record that Bradley shared this information with the rest of the Faculty Defendants or that this information was discussed by the search committee during the

41

interview process. Moreover, the record is devoid of any evidence of the Faculty Defendants discussing Johnson's religion; indeed, the record is unclear as to what religion, if any, Johnson practiced and whether this religion held similar religious beliefs to the Plaintiff's.

The Plaintiff has failed to present any additional evidence beyond the evidence establishing her Title VII claim to show purposeful religious discrimination by the Faculty Defendants. Without further evidence, a rational factfinder could not conclude that the Faculty Defendants intended to discriminate against the Plaintiff because of her religion. Accordingly, summary judgment will be granted as to Plaintiff's equal protection claim.

## IV. CONCLUSION

For the reasons discussed below, the Court will grant in part and deny in part the Commonwealth Defendants' motion for summary judgment. Genuine issues of material fact exist which prevent summary judgment as to Plaintiff's claim for religious discrimination in the hiring/promotion process in violation of Title VII. Therefore, summary judgment will be denied as to this claim. However, the Court will grant the Commonwealth Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim, constructive discharge claim, retaliation

claim and equal protection claim as the Plaintiff has failed to present sufficient evidence from which a reasonable factfinder could find for Plaintiff on essential elements of these causes of action.  The accompanying Order will be entered.


**August 28, 2013**                     **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge